**Opinion issued October 13, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00278-CV

———————————

**JOHN DAVIS D/B/A J.D. HOUSE OF STYLE, Appellant**

**V.**

**NATIONAL LLOYDS INSURANCE COMPANY, Appellee**

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-58199**

---

## O P I N I O N

In this insurance dispute, appellant, John Davis, *d/b/a* J.D. House of Style,

sued appellee, National Lloyds Insurance Company ("National Lloyds"), following

its denial of Davis's claim for damage to his roof and other property caused by

Hurricane Ike. A jury found National Lloyds liable for breach of contract, breach

of the duty of good faith and fair dealing, and knowing violations of the Texas Insurance Code. Regarding damages, the jury determined that the actual cash value of Davis's property damage claim was $0, while the replacement cost value was $100,000.

National Lloyds moved for judgment notwithstanding the verdict, arguing in part that the trial court should (1) disregard the jury's finding on the replacement cost value of Davis's claim and (2) enter judgment on the jury's finding of zero damages based on the actual cash value of the claim. It argued that Davis's policy covered only the actual cash value of the claim and the jury found no damages based on that measure. The trial court granted National Lloyds' motion and rendered a final, take-nothing judgment on Davis's claims.

In his sole issue on appeal, Davis argues that the trial court erred in granting the take-nothing judgment based on National Lloyds' motion "despite legally sufficient evidence to support the jury's material findings in [his] favor." Finding that National Lloyds was not obligated to pay Davis's claim under the insurance policy, we affirm.

## Background

In 1994, Davis purchased a building located at 5901 Laura Koppe in Houston, Texas for $150,000. In the building, Davis opened a barber shop and clothing store, known as J.D.'s House of Style, which also served as Davis's

2

residence. The building was built in the 1960s. The roof was mostly flat with a "modified bitumen"[1] cover, but it also had a gabled portion that was covered with shingles. The record contains no evidence regarding when the roof was installed, but Davis had not replaced it since he acquired the property in 1994.

Davis subsequently purchased an insurance policy from National Lloyds. The policy covered losses from named perils up to $185,000 for the building and $125,000 for the building's contents, with deductibles of $3,700 for the building and $2,500 for the contents. Named perils included fire, hail, and windstorms; however, the policy excluded damage from rain "unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain . . . enters."

Under "Valuation," the policy provided, "We will determine the value of the Covered Property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or damage[.]" The policy also provided for "Optional Coverages," stating, "If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item." Optional Coverages included provisions for "Agreed Value," "Inflation Guard," and "Replacement Cost," which stated that

---

[1] Davis's public insurance adjuster, Christopher Fife, testified that a "modified bitumen" roof is composed of a "roll roofing material," approximately a quarter-inch thick, composed of asphalt modified with rubber to make it very strong and resilient.

"Replacement Cost (without deduction for depreciation) replaces actual cash value in the Loss Condition, Valuation, of this Coverage Form."

The Declarations Page of Davis's policy identified the insured premises and coverage provided by listing a premium number, building number, and basic coverage information in the coverage schedule. Below that was a section stating, "Optional Coverages—applicable only when entries are made in the schedule below." Under the "Optional Coverages" line was a row of headings listing "Prem. No.," "Bldg. No.," "Agreed Value Expiration Date, Coverage, [and] Amount," and "Replacement Cost (X) Building, Personal Property, Including 'Stock'" as information to be entered into the schedule. There were no entries under these headings. In another box, also falling under the "Optional Coverage" schedule, was another row of headings for "Prem. No.," "Bldg. No.," "Inflation Guard (Percentage) Building [and] Personal Property," "Monthly Limit of Indemnity (Fraction)," "Maximum Period of Indemnity (X)," and "Extended Period of Indemnity (Days)." Again, no entries were made in the schedule beneath this row of headings.

In 2005, Hurricane Rita struck the Houston area and Davis's building experienced roof leaks. He made a claim under his policy, which National Lloyds denied. Following the denial of his insurance claim, Davis hired "[t]he guy that

4

was doing my maintenance around the building" to patch the roof. The maintenance man placed white patches on the roof, and the leaks stopped.

In September 2008, Hurricane Ike struck the Houston area. Davis's roof again began leaking and his air conditioning unit was damaged. He also experienced leaking in the interior of the building. Davis made another claim for property damage under his insurance policy. National Lloyds sent Jeffrey Edwards, an insurance adjuster, to evaluate the claim in November 2008. Edwards filed a loss report, stating that his inspection of the flat portion of the roof revealed no visible storm-created openings or damage from Hurricane Ike. He noted minor wind damage to three shingles on the gabled portion of the roof and some damage to "the wood soffit and siding on the roof around the A/C unit." Edwards determined that all of the damage to Davis's property caused by Hurricane Ike would cost a total of $1,825 to repair. Because Davis's deductible was $3,700, Edwards determined that there would be no payment on Davis's claim. National Lloyds accordingly sent Davis a letter denying his claim because the value of covered damage was less than his deductible.

In August 2010, almost two years after Hurricane Ike, a public insurance adjuster, Christopher Fife, determined that Davis's property was damaged as a result of Hurricane Ike.

On September 11, 2010, Davis filed suit against National Lloyds, alleging, in relevant part, that it had failed to comply with the insurance contract, it had knowingly violated various provisions of the Texas Insurance Code, and it had breached its duty of good faith and fair dealing. He complained that National Lloyds and its adjuster failed to properly adjust the claims and denied "at least a portion of the claims without an adequate investigation." He asserted that National Lloyds wrongfully failed to pay his claim and failed to perform its contractual duty to compensate him under the terms of the policy; that National Lloyds "misrepresented to [him] that the damage to the Property was not covered under the Policy, even though the damage was caused by a covered occurrence"; that National Lloyds failed to settle his claim in a fair manner or offer him adequate compensation; and that National Lloyds failed to inform him of its denial of his claim in a timely manner. Davis argued that National Lloyds' liability under the policy was "reasonably clear" from the time he first filed his property damage claim. He also sought attorney's fees under Civil Practice and Remedies Code Chapter 38 and under the Insurance Code.

At trial, Davis presented evidence regarding the history of the roof, including his purchase of the property in 1994, the first roof leaks in 1997, and subsequent damages to the roof and other property during Hurricanes Rita and Ike. He also presented the testimony of his experts, Fife and engineer Peter De La

Mora. Fife testified that, in his experience, hurricane force winds moving over a flat roof move faster than the wind going around the building and "create a vacuum" that can "create uplift on the roof." He stated that a roof like Davis's is "a solid hard tar roof once it's put into place. And if there's any movement or uplift it will cause hairline cracks throughout and then it rains and you have leaks everywhere." He testified that such hairline cracks might not necessarily be visible to the naked eye, "[e]specially when you have a modified cap sheet [that] covers everything." Fife also discussed his findings regarding the water damage to the interior of Davis's building and determined that the water leaks were caused by storm damage. Fife estimated that the total cost of repairs to Davis's property would be $108,038.75. De La Mora testified that he first inspected Davis's property on October 18, 2011. Like Fife, De La Mora identified extensive damage to Davis's property that he believed was caused by Hurricane Ike.

Edwards, the insurance adjuster who performed the original evaluation of Davis's property damage claim, testified at trial regarding his November 2008 evaluation of Davis's building and roof. His report was also entered into evidence. Edwards testified that when he examined Davis's roof in November 2008, he observed "wear and tear" to the roof. He noticed spots where "the granulars [were] worn down" creating depressions in the roof where water could collect, spots where the roof had become more "smushy" than it was supposed to be, and places

7

where the "seams [were] worn and pulled." He used photographs from his report to demonstrate the areas that showed wear and tear. However, he stated that losses from normal wear were not covered under the policy and that he was looking for storm-created openings, such as those created by wind or hail.

National Lloyds presented the testimony of its own experts, Corey Green, an engineer, and Kevin Mohr, an independent insurance adjuster. Green testified that modified bitumen roofs deteriorate and "dry out" as they age and that they can be damaged by water over time. Green examined a 2006 satellite picture of Davis's building and testified that the photo showed that water had been "ponding" on the roof, indicating wear and deterioration two years prior to Hurricane Ike. Regarding the wear and tear he observed on Davis's roof, Green testified that such damage would most likely occur over a long period of time. He stated that, although no one knew exactly how old the roof was at the time of Hurricane Ike, he believed that it was certainly more than fifteen years old and that it "was in very poor condition" before Hurricane Ike hit the area.

Mohr assessed Davis's roof and also reviewed the report Edwards had created in 2008. Mohr agreed with Edwards' finding of no evidence of wind-created openings on the modified bitumen portion of the roof. Mohr found some missing shingles on the gabled portion of the roof and determined that there was a storm-created opening on that portion of the roof, but he testified that none of the

8

interior damage cited by Davis and his experts was caused by leaks from the shingled portion of the roof. He further testified that the damage to Davis's property attributable to Hurricane Ike was less than Davis's deductible. Mohr also testified regarding his understanding of the coverage in Davis's insurance policy.

National Lloyds also presented the testimony of Barry Ringewold, who worked in commercial construction and did inspections and appraisals for insurance companies. Ringewold testified that much of Fife's estimate was inaccurate because "he had scoped for all damage to the property rather than just damage caused by Hurricane Ike" and his "pricing was high and above industry standards." He specifically identified portions of the included repairs that were not attributable to storm damage, including some interior damage that was not caused by water leaks from any source but merely from age and use. He testified that the roof "was aged, near if not past its normal life expectancy" and that "[t]here had been a multitude of past repairs" dating before Hurricane Ike. He identified "visible minute openings that have been discussed earlier at vent locations and areas where there should be flashing and there was not" as places where water could have entered the building, but were not caused by Hurricane Ike. Ringewold testified that the poor condition of the roof was not caused by Ike, "[w]ith the exception of the three or four missing shingle tabs at the gable roof," and, thus, the interior damage to the building was likewise not caused by Ike.

The jury found that National Lloyds violated the Insurance Code by: (1) "misrepresenting to a claimant a material fact or policy provision relating to coverage at issue"; (2) "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability had become reasonably clear"; and (3) "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." *See* TEX. INS. CODE ANN. § 541.060(a)(1), (2)(A), (7) (Vernon 2009). The jury also found that National Lloyds breached its duty of good faith and fair dealing by "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear" or by "refusing to pay a claim without conducting a reasonable investigation of the claim."

Regarding damages, the charge instructed the jury to determine "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Davis] for his damages, if any, that resulted from National Lloyds' failure to comply with the terms of the insurance policy issued to [Davis] with respect to [his] claim arising from Hurricane Ike[.]" The jury was instructed to provide a damages amount based on both the actual cash value and the replacement cost value of the claim. The charge instructed the jury that actual cash value was "[t]he difference, if any, between the value at the time of the loss for damage and the $3,700.00 deductible and applicable depreciation under the policy." *See State*

10

*Farm Fire & Cas. Co. v. Griffin*, 888 S.W.2d 150, 157 n.9 (Tex. App.—Houston [1st Dist.] 1994, no writ) (construing contract provision stating that "'Actual Cash Value' means the replacement cost of an insured item of property at the time of loss, less the value of physical depreciation as to the item damaged").

The charge further instructed the jury that the replacement cost value was "[t]he difference, if any, between the value at the time of the loss for damage and the $3,700.00 deductible under the policy." *See Gary Pools, Inc. v. McCaffety*, No. 03-99-00390-CV, 2000 WL 298279, at *4 (Tex. App.—Austin Mar. 23, 2000, pet. denied) (mem. op., not designated for publication) (holding that replacement cost is measure of "what it would cost to replace or reproduce the article" that was lost or damaged).

The jury answered "0" for damages based on the actual cash value measure. The jury found $100,000 in damages based on the replacement cost measure. The jury also found $17,200 for damages "incurred in attempting to have the property damage repaired"; $150,000 in exemplary damages based on its finding that "National Lloyds' conduct [in violation of the Insurance Code] was committed knowingly"; and $75,000 as reasonable and necessary attorney's fees.

After the trial, Davis moved to disregard the jury's finding of zero for actual cash value damages and for entry of judgment on the remainder of the jury's verdict. National Lloyds filed its own motion for judgment notwithstanding the

verdict and responded to Davis's motion to disregard the jury's finding of zero for actual cash value, arguing that the policy covered only the actual cash value of Davis's property damage claim, not the replacement value. It argued that the evidence was sufficient to support the jury's finding of zero for the actual cash value damages but was insufficient to support the jury's remaining findings. Thus, National Lloyds asked for entry of judgment based on the jury's finding of zero damages for the actual cash value of Davis's claim.

The trial court granted National Lloyds' motion and denied Davis's motion for entry of judgment. The trial court rendered a final, take-nothing judgment on Davis's causes of action. This appeal followed.

## Standard of Review and Relevant Law

In his sole issue on appeal, Davis argues that the trial court erred in rendering a take-nothing judgment on his claims based on National Lloyds' motion seeking to disregard the jury's finding on replacement cost damages and to enter judgment based on the finding of zero damages for the actual cash value of the claim. Davis further argues that the trial court was required to disregard the jury's finding of zero actual cash value damages and to render judgment on the replacement cost value.

## A.      Review of Motion to Disregard Jury Finding

Upon motion and reasonable notice, a trial court may "disregard any jury finding on a question that has no support in the evidence." TEX. R. CIV. P. 301. Thus, a trial court may disregard a jury finding if (1) the finding is immaterial or (2) there is no evidence to support one or more of the jury findings on issues necessary to liability. TEX. R. CIV. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A finding is immaterial when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157.

We review the grant or denial of a motion for judgment notwithstanding the verdict or a motion to disregard jury findings as a legal-sufficiency challenge. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 827; *see Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (holding that, in reviewing "no evidence" point, court views evidence in light that tends to support finding of disputed fact and disregards all evidence and

inferences to contrary). To sustain a challenge to the legal sufficiency of the evidence supporting a jury finding, the reviewing court must find that (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

**B.      Construction of Insurance Policy**

We analyze insurance contracts using the well-established principles of contract construction. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). The construction of an unambiguous contract is a matter of law to be determined by the court. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law." *Id.* Whether a particular provision or the interaction among multiple provisions creates an ambiguity is likewise a question of law. *Page*, 315 S.W.3d at 527.

"The fact that the parties may disagree about the policy's meaning does not create an ambiguity." *Id.* "Only if the policy is subject to two or more reasonable interpretations may it be considered ambiguous." *Id.* We may not use extrinsic evidence to contradict or vary the meaning of the explicit language of a written

14

contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995).

"Our primary goal is to determine the contracting parties' intent through the policy's written language." *Page*, 315 S.W.3d at 527. We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provisions within the policy inoperative. *Id.* We must give effect to all contractual provisions so that none will be rendered meaningless. *Schaefer*, 124 S.W.3d at 157. Our analysis of the policy is confined within the four corners of the policy itself. *Page*, 315 S.W.3d at 527.

To establish a breach of contract, a plaintiff must prove (1) the existence of a valid contract, (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract, and (4) the plaintiff's damages as a result of the breach. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see also Certain Underwriters at Lloyd's v. KKM Inc.*, 215 S.W.3d 486, 489 (Tex. App.—Corpus Christi 2006, pet. denied) (providing that plaintiff must establish that contract existed that created duties, which were breached by defendant, resulting in damages). Thus, in the context of an insurance policy, a plaintiff must prove the existence of a valid insurance policy covering the denied claim and entitlement to money damages on

that claim. *See KKM Inc.*, 215 S.W.3d at 490; *Prime Prods., Inc.*, 97 S.W.3d at 636.

### Disregard of Jury Finding on Replacement Value

The trial court submitted two measures of damages to the jury, and the jury determined that Davis sustained $0 damages based on the actual cash value of the property claim and that he sustained $100,000 in damages based on the replacement value of the property claim. National Lloyds moved to disregard the replacement value finding, arguing, in part, that the plain language of the policy itself limited Davis to recovery for the actual cash value of his property damage claim. Davis argues, however, that the trial court was required to disregard the jury's finding of no actual cash value damages and to render judgment on the replacement cost damages. Accordingly, we must first interpret Davis's insurance policy to determine the extent of his coverage and to determine whether the trial court properly disregarded the jury's finding on the replacement cost value of Davis's claim.

Davis's insurance policy provided that National Lloyds would "determine the value of the covered property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or damage." The Optional Coverage provision stated that "Replacement Cost (without deduction for depreciation) replace[d] Actual Cash Value in the Loss Condition, Valuation of this Coverage Form" if such

16

coverage was "shown as applicable in the Declarations." The Declarations Page had a section stating, "Optional Coverages—applicable only when entries are made in the schedule below." However, no entries for optional coverage were made on the schedule.

Reading all parts of the policy together and giving effect to each word, clause, and sentence, as we must, we conclude that the policy expressly stated that it covered the actual cash value of a loss unless the optional coverage for replacement cost was entered into the schedule on the Declarations Page. *See Page*, 315 S.W.3d at 527; *Schaefer*, 124 S.W.3d at 157. Here, there was no such entry of optional coverage for replacement cost, and thus no optional coverage applied. We conclude, based on the plain language contained in the policy, that it covered only the actual cash value of Davis's property damage claim.

Davis argues that the "(X)" in the heading for "Replacement Cost" under the Optional Coverage section of the Declarations Page indicates that he selected the Optional Coverage for replacement value, or it at least creates an alternative reasonable interpretation of the policy. He argues that because there is an ambiguity in the policy, it must be construed against National Lloyds. *See Certain Underwriters at Lloyd's of London v. Cardtronics, Inc.*, 438 S.W.3d 770, 777 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding in context of insurance dispute that "the normal canons of interpretation—which apply to the

17

interpretation of insurance policies—also provide that an ambiguous contract is generally construed against its drafter").

However, the "(X)" that Davis relies upon to show his purported selection of optional coverage is insufficient under the plain language of the insurance policy to demonstrate the existence of replacement cost coverage. The Declarations Page expressly states that Optional Coverages are "applicable only when entries are made in the schedule below," which requires the entry of a premium number and a building number in addition to other information depending on the type of optional coverage. No such entries were made on the Optional Coverage Schedule.

Davis argues in the alternative that the policy is at least ambiguous because there are two reasonable interpretations of the extent of his coverage, and, thus, the policy must be construed against National Lloyds. *See, e.g.*, *RSUI Indem. Co. v. The Lynd Co.*, —S.W.3d—, No. 13-0080, 2015 WL 2194201, at * 3 (Tex. May 8, 2015) (holding that courts must resolve ambiguities in policy in favor of insured). He cites the testimony of National Lloyds' independent insurance adjuster, Mohr, regarding his understanding of Davis's policy and his statement that it was "reasonable" to interpret Davis's policy as covering the replacement-cost value of a property damage claim. However, Mohr's testimony on the interpretation of Davis's policy is irrelevant, as the interpretation of a contract is a question of law

to be determined by the court based on the language in the policy itself. *See Page*, 315 S.W.3d at 527; *Schaefer*, 124 S.W.3d at 157.

We likewise disagree that the policy is ambiguous. "If only one party's construction is reasonable, the policy is unambiguous and we will adopt that party's construction." *RSUI Indem. Co.*, 2015 WL 2194201, at \*3. Here, the only reasonable interpretation of the contract that gives meaning to all of the provisions in Davis's policy is that the absence of any entries in the Optional Coverage Schedule means that the valuation provision applies as written: National Lloyds "will determine the value of Covered Property in the event of loss . . . [a]t actual cash value as of the time of loss or damage[.]" *See id.*; *Page*, 315 S.W.3d at 527 ("We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provisions within the policy inoperative."). Because the wording of the policy can be given a definite legal meaning, no ambiguity exists. *See RSUI Indem. Co.*, 2015 WL 2194201, at \*3; *Page*, 315 S.W.3d at 527 (holding that policy is not ambiguous if it is worded so that it can be given definite or certain legal meaning and that policy is ambiguous only if it is subject to two or more reasonable interpretations). The policy here covered the actual cash value of Davis's property claims and cannot reasonably be construed as providing coverage for replacement cost value "without deduction for depreciation."

Finally, Davis argues that the trial court erred in disregarding the finding on replacement cost damages because the jury heard evidence regarding whether the policy was an actual cash value or a replacement cost value policy and that, by its award of $100,000 in damages for replacement cost value, it decided this question in his favor. However, as discussed above, the interpretation of an insurance policy is a question of law for the court to decide based on the language in the policy itself, not a question of fact to be determined by the jury. *See Page*, 315 S.W.3d at 527; *Schaefer*, 124 S.W.3d at 157. The question of whether the insurance policy covered the actual cash value or the replacement cost value was never submitted to the jury. The charge instructed the jury to find damages based on two different measures of damages, and we must presume that the jury followed the instructions in the charge. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003) (holding that, unless record demonstrates otherwise, we must presume jury followed instructions given). The jury's finding here on the amount of damages cannot be considered a finding determining the terms of the policy.

We conclude, as a matter of law, that the policy covered only the actual cash value of Davis's property damage claim. Thus, the interpretation of the insurance policy, as a matter of law, barred the trial court from considering the jury's findings on Davis's replacement cost damages. *See Volkswagen of Am., Inc.*, 159

S.W.3d at 903 (holding that court may sustain legal sufficiency challenge if court is barred by rules of law from giving weight to only evidence offered to prove vital fact); *City of Keller*, 168 S.W.3d at 823 (holding that we review motion to disregard jury finding as legal-sufficiency challenge). The trial court properly disregarded the jury's finding on the replacement cost value measure of damages. *See* TEX. R. CIV. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991) (holding that trial court may disregard jury finding if directed verdict would have been proper because legal principle precludes recovery).

### Take-Nothing Judgment Based on Zero Actual Cash Value Damages

Having held that the trial court properly disregarded the jury's finding on replacement value damages, we must now determine whether the trial court erred in entering a take-nothing judgment based on the finding of zero actual cash value damages. Davis argues that, even if we conclude that the policy covers only the actual cash value of his claim, the jury's award of zero actual cash value damages is not supported by the evidence. Davis also argues that sufficient evidence supported the jury's liability findings on his breach of contract and extra-contractual claims and that the jury's finding of zero actual cash value damages cannot be reconciled with—and is in "fatal conflict" with—its liability findings.

21

## A. Sufficiency of the Evidence Supporting Finding of Zero Actual Cash Value Damages

The jury was asked, "What sum of money, if any, . . . would fairly and reasonably compensate John Davis for his damages, if any, that resulted from National Lloyds' failure to comply with the terms of the insurance policy[?]" It was then instructed on two different measures:

1. (Actual Cash Value) The difference, if any, between the value at the time of the loss for damage and the $3,700.00 deductible and applicable depreciation under the policy.

2. (Replacement Cost Value) The difference, if any, between the value at the time of the loss for damage and the $3,700 deductible under the policy.

The jury answered "0" for actual cash value damages. Davis argues that the evidence is insufficient to support the jury's finding of zero actual cash value damages. Essentially, Davis argues that the trial court should have granted his own motion to disregard the jury finding of zero actual cash value damages.

In reviewing the trial court's entry of judgment based on the jury's finding of zero actual cash value damages, we must determine whether there is any evidence upon which the jury could have made the finding at issue. *See Tiller*, 121 S.W.3d at 713. We will affirm the jury verdict if there is any evidence of probative value to support it. *Trinity Indus.*, 53 S.W.3d at 862–63.

Davis's policy covered damage from windstorms; however, it did not cover damage from rain unless the property first sustained wind or hail damage to its roof

22

or walls through which the rain entered. Davis's policy, under its express terms, did not cover damage resulting from normal deterioration, and the parties agree that this suit involved damage to Davis's property allegedly caused by Hurricane Ike.

Accordingly, Davis bore the burden of producing evidence affording a reasonable basis for estimating the amount of damage or the proportionate part of the damage caused by Hurricane Ike. *See Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971); *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). When covered and non-covered perils combine to create a loss, the plaintiff likewise bears the burden to segregate the damage attributable solely to the covered event, and the failure to meet this burden is fatal to recovery. *See Travelers Indem. Co.*, 469 S.W.2d at 162–63; *Comsys Info. Tech. Servs., Inc.*, 130 S.W.3d at 198 (holding that when covered and non-covered perils combine to create loss, insured is entitled to recover that portion of damage caused solely by covered peril). Davis thus bore the burden of producing evidence of the actual cash value of his claim or the depreciated value of his property before the loss from Hurricane Ike.

Here, the evidence demonstrated that the building was built in the mid-1960s and thus was approximately 45 years old at the time of Hurricane Ike, that Davis

had not replaced the roof since he purchased the property in 1994, and that the roof leaked as early as 1997 and had been further damaged during Hurricane Rita in 2005. Edwards, Mohr, Green, and Ringewold testified regarding the deteriorated condition of the roof. Green stated that the roof "was in very poor condition" before Hurricane Ike hit, and Ringewold testified that the roof "was aged, near if not past its normal life expectancy" at the time Ike struck. Edwards and Mohr both testified that most of the damage to the roof was the result of normal wear and tear and thus the water damage to the interior was likewise the result of that wear and tear. All of National Lloyds' experts agreed that the actual cash value of Davis's claims did not exceed his deductible.

Davis's testifying experts, Fife and De La Mora, testified that they believed Hurricane Ike caused the damage to Davis's property and estimated that the total cost of repairs was over $100,000. They also concluded that, even accounting for depreciation, his damages would exceed his deductible. However, Davis presented no evidence of the depreciated value of his roof or other property at the time of his loss from Hurricane Ike, and he acknowledges in his brief that National Lloyds' witness, Mohr, was the only person who opined on depreciated value.

We conclude that there is evidence of probative value supporting the jury's finding of zero actual cash value damages. *See Tiller*, 121 S.W.3d at 713; *Trinity Indus.*, 53 S.W.3d at 863. Although Davis's experts testified generally that, even

accounting for depreciation, the value of his claim would exceed his deductible, National Lloyds' experts all testified that the damage attributable to Hurricane Ike did not exceed the deductible. It is within the jury's province to resolve conflicts in the evidence, and, here, it is reasonable to assume that it resolved all such conflicts in favor of its verdict. *See City of Keller*, 168 S.W.3d at 819 (holding that we must assume jury resolved conflicts in evidence in favor of its verdict if reasonable people could do so).

The evidence also indicated that depreciation from age and damage from other non-covered perils, such as Hurricane Rita, had caused damage to the roof prior to Hurricane Ike. Davis presented no evidence of the depreciated value of his roof, nor did he provide any evidence segregating the cost of repairs beyond Fife's testimony that it would cost in excess of $100,000 to restore the damaged property. Thus, Davis did not meet his burden of producing evidence affording a reasonable basis for estimating the amount of damage or the proportionate part of the damage caused solely by Hurricane Ike. *See Travelers Indem. Co.*, 469 S.W.2d at 163; *Comsys Info. Tech. Servs., Inc.*, 130 S.W.3d at 198.

We conclude that the evidence was sufficient to support the jury's finding of zero actual cash value damages.

**B. Take-Nothing on Breach of Contract Claim**

Davis argues that he presented sufficient evidence showing that National Lloyds failed to comply with the insurance policy by failing to pay his property damage claim. In Question 1, the jury was asked, "Do you find that National Lloyds failed to comply with the terms of the insurance policy issued to [Davis] with respect to his claim arising from Hurricane Ike?" It was instructed to consider that the policy insured against physical loss to the property caused by a windstorm or hail but not damage to the interior unless the building first sustained wind or hail damage to the roof or walls through which rain entered. The jury answered, "Yes." However, the jury also found that Davis suffered zero actual cash value damages. At trial and on appeal, National Lloyds argues that there was no evidence that it breached the insurance contract based on the jury's finding of zero actual cash value damages. We agree with National Lloyds.

We have concluded as a matter of law that the insurance policy covered only the actual cash value of Davis's claim. The jury determined that Davis was entitled to no money based on that measure of damages. Accordingly, we conclude that there was no breach of the insurance policy here: National Lloyds did not breach the insurance policy by failing to pay Davis's claim because Davis was not due any money under the terms of the insurance policy and the facts of the case as found by the jury. *See KKM Inc.*, 215 S.W.3d at 490 (holding that plaintiff

26

claiming breach of insurance policy must prove existence of valid insurance policy covering denied claim and entitlement to money damages on that claim).

## C.     Extra-Contractual Claims

Likewise, Davis argues he presented sufficient evidence that National Lloyds violated various provisions of the Insurance Code and its common-law duty of good faith and fair dealing.  Jury Question 2, which was conditioned on an affirmative answer to Question 1 concerning breach of the insurance policy, asked whether National Lloyds engaged in any unfair or deceptive act or practice that caused damages to Davis.  The jury found that National Lloyds violated the Insurance Code by (1) misrepresenting to Davis a material fact or policy provision relating to the coverage at issue, (2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Davis's claim after its liability had become reasonably clear, and (3) refusing to pay Davis's claim without conducting a reasonable investigation with respect to his claim.  *See* TEX. INS. CODE ANN. § 541.060(a)(1), (2)(A), (7).  The jury found, in response to Question 3, that National Lloyds engaged in such behavior knowingly.  The jury also found, in response to Question 4, that National Lloyds breached its common-law duty of good faith and fair dealing by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Davis's claim after its liability had become reasonably clear or by refusing to pay the claim without conducting a

27

reasonable investigation of the claim. Davis asserts that these findings are supported by sufficient evidence and entitle him to recovery from National Lloyds.

The Insurance Code prohibits insurers from engaging in enumerated "unfair settlement practices with respect to a claim" by an insured under an insurance policy. *See id.* § 541.060(a). Relevant here, section 541.060(a) provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary:
>
> (1) misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue;
>
> (2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear; [or]
>
> . . . .
>
> (7) refusing to pay a claim without conducting a reasonable investigation with respect to the claim[.]

*Id.* Likewise, an insurer violates its common-law duty of good faith and fair dealing when it has no reasonable basis for the denial or delay in payment of the insured's claim and the insurer knows or should have known of that fact. *See Hudspeth v. Enter. Life Ins. Co.*, 358 S.W.3d 373, 389 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558, 568–69 (Tex. App.—San Antonio 2011, pet. denied) (holding that legal standard applicable to determining claims under Insurance Code for failing to attempt good-

28

faith settlement also apply to common-law claim) (citing *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997)).

Here, the jury's findings holding National Lloyds liable under Insurance Code section 541.060 and for breach of the common-law duty of good faith and fair dealing cannot stand in light of the resolution of the underlying coverage dispute. *Cf. Page*, 315 S.W.3d at 532 (holding, in context of Insurance Code chapters 541, 542, and 551, that "[w]hen the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive"); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) (holding that Texas generally does not recognize claim for bad faith when insurer denies claim that is not covered under insurance policy). "The contract aspect of a coverage dispute concerns either the factual basis for the claim, the proper legal interpretation of the policy, or both." *Southland Lloyds Ins. Co.*, 399 S.W.3d at 568 (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994)). "If the loss is covered, the insurer must pay the claim pursuant to the terms of the insurance contract." *Id.* However, when, as here, it has been determined that no payment was obligated under the terms of the insurance contract, then the insurer cannot be liable for bad faith. *See id.* ("The threshold of bad faith is reached when a breach of contract is accompanied by an independent tort.") (quoting *Moriel*, 879 S.W.2d at 17).

We have determined that National Lloyds was not obligated to make any payment to Davis under the terms of the insurance policy. Thus, it necessarily did not "misrepresent" the coverage offered by Davis's policy in telling him that it would not pay his claim; nor did it fail to effectuate a settlement of a claim with respect to which its liability had become reasonably clear or otherwise improperly refuse to pay the claim.[2] *See* TEX. INS. CODE ANN. § 541.060(a); *Page*, 315 S.W.3d at 532; *Southland Lloyds Ins. Co.*, 399 S.W.3d at 568.

Davis further argues that he provided sufficient evidence of additional damages for repair costs he incurred after National Lloyds denied his claim, but this is not a question of sufficiency of his evidence of damages. His entitlement to recover repair costs is based on National Lloyds' wrongful denial of his insurance claim. *See United Nat'l Ins. Co. v. AMJ Invs., LLC*, 447 S.W.3d 1, 8–10 (Tex.

---

[2] The Texas Supreme Court has left open "the possibility that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim." *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005); *Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2001). However, Davis does not argue on appeal, nor did he allege in his pleadings or provide any evidence at trial, that National Lloyds' conduct here was extreme or produced damages unrelated to and independent of his property damage claim. His contentions at trial and on appeal all revolve around his allegations that National Lloyds wrongfully denied his Hurricane Ike claim. Although Davis complains of the investigation completed by National Lloyds' adjuster, Edwards, on the basis that Edwards was unqualified and his investigation was not thorough, he cannot establish any damages attributable to these alleged failures. The jury determined that Davis sustained zero actual cash value damages, and, thus, there is no reason to believe that a more thorough investigation by National Lloyds would have resulted in its paying his claim.

App.—Houston [14th Dist.] 2014, pet. dism'd) (discussing compensatory damages such as costs to repair or replace any damage covered under insurance policy when jury found that insurer underpaid property damage claim). Because we have determined as a matter of law that he was entitled only to the actual cash value of his property damage claim, and the jury determined that the value of that claim was $0, National Lloyds' denial of his claim was not wrongful and Davis is not entitled to collect repair costs.

**D.      Reconciling Zero Damages Finding with Liability Findings**

Davis further argues that the jury's finding of zero actual cash value damages "cannot be reconciled with the jury's answers" regarding National Lloyds' breach of the insurance policy, knowing engagement in unfair or deceptive acts or practices in violation of the Insurance Code, and breach of its duty of good faith and fair dealing. He argues that there is a "fatal conflict" in the jury's findings. *See Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 275–76 (Tex. 2012). National Lloyds argues, however, that there is no fatal conflict in the jury's answers and that the trial court properly entered a take-nothing judgment.

Jury findings can conflict or be inconsistent, or even be in "irreconcilable conflict," and still not be fatal to entry of judgment; however, if the jury findings create a conflict about the same material fact, and one of the conflicting findings

31

"necessarily requires the entry of judgment different from that which the court has entered," then the conflict in jury findings is fatal to entry of judgment. *See id.*

Davis argues that the jury's findings that National Lloyds breached the insurance policy and breached common-law and statutory duties "required the jury to find that some payment was owed" to Davis, and, thus, the "[j]ury answers are in fatal conflict" because the liability findings would require a judgment in Davis's favor, while the finding of zero actual cash-value damages would require a judgment in National Lloyds' favor. However, the judgment here was not rendered based solely on jury findings. Rather, a post-trial ruling construed the insurance policy as requiring payment only for the actual cash value of a claim. That legal determination coupled with the jury's finding of zero actual cash value damages compels the rendition of judgment that National Lloyds is not liable for money damages on Davis's claim.

Although the jury findings here are inconsistent, they do not create a conflict about the same material fact or necessitate the entry of a judgment different from that which the trial court has entered here, and, thus, the conflict in jury findings is not fatal to entry of judgment. *See id.*

We overrule Davis's sole issue on appeal.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Massengale.