**Opinion issued April 15, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00308-CV

———————————

**AMY POWELL, Appellant**

**V.**

**USAA CASUALTY INSURANCE CO., Appellee**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-22800**

---

### MEMORANDUM OPINION

Appellant Amy Powell appeals the district court's order granting summary judgment in favor of appellee USAA Casualty Insurance Co., on Powell's claims for breach of insurance contract and for violations of the Insurance Code. Powell

contends that summary judgment was improper because (1) USAA did not move for summary judgment on a ground stated in its letters rejecting her insurance claims as required by the Insurance Code, and (2) genuine issues of material fact exist regarding her breach of contract claims.

We affirm.

## Background

In 2010, Powell bought a house on Cypress Park Drive in Houston. She moved into the house shortly after buying it, and it is her primary residence. The house was in disrepair when Powell bought it, however, and she agreed as part of the purchase to make repairs to it. She testified that she spent at least $100,000 repairing the pool, fence, air conditioner, plumbing, roof leaks, and broken windows and doors. But Powell did not replace the roof, and she estimated that the previous owner had replaced it after a fire sometime before she bought the house.

### A.    Powell's USAA Homeowner's Policies

Powell obtained three homeowner's policies from USAA insuring her house between 2014 and 2016. The first policy issued in August 2014, but it was cancelled in May 2015. The second policy issued in September 2015, but it was cancelled on March 11, 2016. USAA issued a third policy on April 5, 2016, effective for one year.

The policy beginning April 5, 2016, which is the only policy in the record on appeal, provides the following coverage:

2

**COVERAGE A – DWELLING PROTECTION COVERAGE AND COVERAGE B – OTHER STRUCTURES PROTECTION COVERAGE**

We insure against **"sudden and accidental"**, direct, physical loss to tangible property described in PROPERTY WE COVER – Coverages A and B unless excluded in Section I – LOSSES WE DO NOT COVER.

COVERAGE C – PERSONAL PROPERTY PROTECTION

We insure against **"sudden and accidental"**, direct physical loss to tangible property described in PROPERTY WE COVER – Coverage C caused by a peril listed below unless the loss is excluded in **LOSSES WE DO NOT COVER UNDER DWELLING PROTECTION, OTHER STRUCTURES PROTECTION AND PERSONAL PROPERTY PROTECTION.**

* * * *

2.      Windstorm or hail.

The policy defines "sudden and accidental" as "an abrupt, fortuitous event which is

unintended from the perspective of a reasonable person."

The policy expressly excludes the following from coverage:

**LOSSES WE DO NOT COVER UNDER DWELLING PROTECTION AND OTHER STRUCTURES PROTECTION.**

1.      Unless otherwise stated in 3. below we do not insure for damage consisting of or caused directly or indirectly by any of the following[:]

* * * *
        f.      Wear and tear, marring, deterioration;

* * * *

3

m. Vermin meaning animals, other than l. above, that access real or personal property for foraging and shelter and by their presence cause damage to such property. . . .[1]

* * * *

2. If items 1.f. through 1.o. above cause water damage which is not otherwise excluded, we cover the resulting water damage . . . .

3. If any item in 1. above directly causes a **"named peril(s)"** to occur, the resulting damage produced by the **"named peril(s)"** is covered unless otherwise excluded or excepted elsewhere in this policy.

* * * *

## LOSSES WE DO NOT COVER UNDER DWELLING PROTECTION, OTHER STRUCTURES PROTECTION AND PERSONAL PROPERTY PROTECTION

1. We do not insure for damage consisting of or caused directly or indirectly by any of the following[:]

* * * *

c. **Water Damage** arising from, caused by or resulting from human or animal forces, any act of nature, or any other source. Water damage means damage caused by or consisting of:

(1) Flood, surface water, . . . or spray from any of these, whether or not driven by wind . . . .

* * * *

i. **Microbial Organisms**, including but not limited to mold, mold spores, fungus, bacterium or parasitic

---

[1] This provision appears in an endorsement that deleted and replaced the language in the policy.

4

microorganisms. However, we will repair or tear out and replace **"property damage"** resulting from a covered loss even if microbial organisms are present.[2]

As a condition of coverage under this section, the policy provides, "This policy applies only to loss in SECTION I . . . , which occurs during the policy period." The policy does not define "loss." After a loss, the policy requires the insured to "[p]rotect the property from further damage" and "[m]ake reasonable and necessary repairs to protect the property . . . ."

## B. Powell's Claims Under the USAA Policy

On April 17 and 18, 2016, Houston flooded in the Tax Day Floods. Powell filed a claim with the Federal Emergency Management Agency (FEMA) for flood damage to her home and personal property. FEMA approved Powell's claim and paid her $13,954.13 to repair flood damage in several rooms in her house, and $947.48 for flood damage to her personal property.

On June 14, 2016, Powell filed a claim with USAA for damage to the interior of her home from an air conditioning leak and a washing machine that overflowed. The same day, USAA acknowledged receipt of Powell's claim in an email. USAA hired a plumber to inspect the leaks. According to USAA's claim notes, the plumber reported that the washing machine overflowed because of tree roots in the drain line.

---

[2]  This provision appears in an endorsement that deleted and replaced the language in the policy.

5

The plumber also determined that the air conditioning leak was caused by pin-hole leaks in the piping that were not leaking at the time of the inspection, and that condensation dripping off of uninsulated pipes may have also contributed to the water damage in Powell's house. Meanwhile, Powell hired a remediation company to dry the water from the washing machine overflow. According to USAA's claim notes, the remediation company found water damage due to a leaking drip pan under the air conditioning unit. The remediator also stated that wind blew tree limbs onto the roof, causing water damage to various ceilings in Powell's home. The remediator also stated that there was minor damage from the Tax Day Floods, which FEMA had already covered.

On July 6, 2016, a USAA adjuster inspected Powell's property with a representative from Powell's remediation company. After the inspection, USAA determined that Powell had three claims: (1) an air conditioning system leak; (2) a roof leak; and (3) a washing machine overflow that damaged the master bedroom.

USAA hired Stephens Engineering Consultants, Inc. (SEC), to inspect Powell's claimed damage and to "determine the origin and cause of [the] purported damage, if any, and determine if the damage was the result of water intrusion." SEC issued a ten-page report on July 28, 2016. The report included weather data showing that hail one inch in diameter fell at Powell's house for more than twenty minutes on April 17, 2016. SEC inspected Powell's roof for indications of hail and found

6

"[a]pproximately 1/4-inch spatter marks with no corresponding indentations or areas of granule loss . . . on the roof shingles[.]"

The report also made conclusions regarding Powell's interior damage in each room. The report concluded that neither wind nor hail damaged Powell's roof. The report attributed various causes to the water damage observed in Powell's home, including gaps between plumbing vent pipes and flashing, animal damage to vent pipes, repeated and ongoing condensation leaks from the air conditioning system, repeated and long-term moisture penetrating through unsealed brick veneer, lack of weep holes to drain water from behind the brick veneer, and fractured roof decking from workers walking on the roof. SEC could not "rule out an overflowed washing machine in the laundry room as a contributing factor to the moisture stains."

On August 8, 2016, USAA's adjuster inspected Powell's property a second time. According to USAA's claim notes, Powell made comments during the inspection that raised concerns that she may have misrepresented the condition of her house when applying for the USAA policy and when her claimed damage occurred.[3] Based on these concerns, Powell's claims were referred to USAA's internal investigation unit. USAA's investigator hired a third-party to obtain a statement from Powell. According to the third-party notes, Powell first noticed wet

---

[3]    The adjuster was also concerned that Powell may have lacked an insurable interest in the house, although USAA concedes that Powell owned the house.

carpet in a closet adjacent to the overflowing washing machine in March 2016, and she first noticed damage in the wet bar in April 2016. Powell also stated that the only interior damage covered by FEMA was to a sunken den that flooded. USAA requested FEMA documentation from Powell, which she provided on September 29, 2016.

USAA's investigator also hired outside legal counsel to examine Powell under oath and to issue a legal opinion regarding coverage.[4] According to the opinion, which is dated March 6, 2017, Powell had to confirm that her home had no unrepaired damage in April 2016 when she applied for the policy. Moreover, the policy effective April 2016 upgraded the quality of the roof and listed the date of its most recent replacement as 2011, whereas the prior policies listed this date as 2009. The legal opinion stated, "There are questions regarding when the losses occurred and the condition of the home on April 5, 2016[,] when the policy issued." For example, Powell admitted that the washing machine overflowed one to four weeks prior to the Tax Day Floods and that she first noticed damage in March 2016. She did not know when the loss from the air conditioning leak occurred because the damage was hidden by a drop-down ceiling and a broken light. The opinion relied

---

[4] Although USAA's motion for summary judgment lists the transcript of Powell's examination under oath as Exhibit K, the transcript is not included in the record on appeal. Exhibit K instead appears to be a duplicate of USAA's Exhibit C.

on SEC's report that Powell's roof damage was caused by wear and tear and maintenance issues, not wind or hail, and that her personal property damages were caused by marred vent pipe flashing in the roof.

The opinion concluded that USAA could reasonably question whether the washing machine overflowed prior to the effective date of the policy in April 2016, whether FEMA had already reimbursed Powell for some of the damage she claimed with USAA, and whether Powell accurately described and valued her personal property damage. The opinion also stated that Powell had not protected her property from further damage or made reasonable repairs to protect it, particularly the roof, which may have affected USAA's ability to evaluate her damages.

In three letters dated March 30, 2017, USAA rejected each of Powell's claims. Each letter provided an identical claim decision: "USAA CIC has determined that you misrepresented and concealed facts in the presentation of this claim. As a result, your claim for [sic] is denied." The letters provided additional detail regarding USAA's rejection of each claim. The letter rejecting the claim for the air conditioner leak stated that Powell could not recall when the damage had occurred. The letter rejecting the claim for the washing machine overflow stated that Powell admitted the loss occurred in March 2016, several weeks before the April 2016 Tax Day Floods, leading USAA to estimate that the damage occurred between March 21 and April 11, 2016. The letter rejecting the roof leak claim stated that Powell's roof was

not damaged by wind or hail, but any leaks were instead due to wear and tear or maintenance issues, neither of which was covered under the policy. The letters denying Powell's claims for the washing machine overflow and roof leaks also stated that USAA's engineer had determined that Powell's personal property was damaged from "moisture penetration through the marred, lead plumbing vent pipe flashing on the roof." All three rejection letters also stated that, when applying for the policy, Powell confirmed there was no unrepaired damage to her house on April 5, 2016, and that the quality and age of the roof was upgraded in the most recent policy application as discussed above.

## C. Powell's Lawsuit Against USAA

Powell filed the underlying lawsuit against USAA, asserting claims for breach of contract and violations of the Insurance Code. Powell alleged that USAA violated the prompt-payment provisions of the Insurance Code by inspecting her property more than fifteen days after she filed her claims and by rejecting her claims nine months after she filed them. Powell also alleged that USAA's delay caused the damage to worsen. USAA filed an answer generally denying the allegations and asserting numerous affirmative defenses, including that Powell's damages existed prior to the effective date of the policy, that the policy did not cover the damages, and that Powell failed to mitigate her damages.

### 1.    USAA's Motion for Summary Judgment

USAA filed a traditional and no evidence motion for summary judgment. USAA argued that Powell had no evidence that her claimed losses were covered under the terms of the policy or occurred during the policy period. USAA contended that Powell's house was in disrepair when she bought it, that it incurred damage prior to the effective date of the policy, and that the damage was not covered under the policy. USAA also argued that Powell's claims for Insurance Code violations failed as a matter of law because she could not establish a breach of the insurance contract and because Powell had no evidence any harm resulted from USAA's alleged violations of the Insurance Code.

In support of its motion, USAA attached numerous exhibits, including: (1) the homeowner's policy effective in April 2016; (2) the SEC engineer's report; (3) the legal opinion regarding coverage; and (4) the three claim rejection letters, each of which is discussed above. USAA also attached its notes from Powell's claim file.

USAA also relied on two depositions of Powell: one from a prior lawsuit and one in the underlying proceedings. In the prior lawsuit, Powell testified that her house sat vacant for two years before she bought it. As part of the agreement to buy the house, Powell agreed to repair the damage to the house. She claimed to have spent at least $100,000 repairing the pool, fence, air conditioner, plumbing, roof leaks, and broken windows and doors. In her deposition in the underlying

proceeding, Powell similarly testified that she repaired the pool, fence, and some plumbing. She had also replaced some carpet. She further testified that a new roof was installed on the house prior to her purchasing it. Later, wind and hail in the Tax Day Floods damaged her home. She acknowledged that she also sustained flood damage, but FEMA covered some exterior damage and damage to a sunken den. She saw mold begin to form after the flood damage, but she had not made any efforts to remediate the mold due to a lack of financial resources.

Powell testified that she did not know her roof was leaking until the remediation company she hired discovered the damage in June 2016. Powell acknowledged that she had not made any repairs to the roof and that she had obtained three estimates from roofing contractors to replace it.

USAA also attached a second engineer's report from Insight Engineering, L.P., a company hired by USAA "to render a professional opinion as to the extent of damage to [Powell's] residence as a result of a reported overflow of the clothes washing machine drain pipe, drywall stains on the bar ceiling, and damage to the roof shingles from a tree branch impact during a June 14, 2016 weather event." Insight, hired after Powell filed the lawsuit, inspected Powell's house on May 16, 2018, and issued a report on October 18, 2018. The report concluded that Powell's washing machine overflowed due to tree roots blocking the drain. Insight determined that much of the damage to the interior of Powell's house was caused by long-term

12

water exposure from the washing machine, air conditioning system condensation, and gaps in roof vents. Regarding the roof, the report stated that "[t]he laminate shingles and skylight covers were in good condition and appeared to be less than 10 years old." However, the report stated that damage to the living room ceiling was "consistent with predating the present skylights/shingles as there is no evidence of an active leak, localized repairs or localized damage on the roof." The report concluded that there was no evidence of wind or hail damage.

USAA also relied on depositions of three of Powell's witnesses. Pat Raney prepared an estimate to replace Powell's roof. Raney inspected Powell's roof one to two years before his deposition in January 2019. He saw indications of hail damage to Powell's roof, and he recalled that the most recent hailstorm prior to his inspection was during the Tax Day Floods, although he could not say when the hail damage to Powell's roof occurred. Raney testified that, in his experience, he had seen dime-sized hail cause damage to a roof. He stated that, in addition to the size of hail, a longer duration and higher density of hail is more likely to cause roof damage. Raney could not recall whether he inspected Powell's attic, and he did not attempt to determine the cause of any of the water damage in Powell's home. Raney estimated Powell's roof to be fifteen years old based on wear and tear. He acknowledged that it was possible Powell's roof damage was caused by maintenance issues and that he observed animal damage to vent pipes.

Daniel Coll and Lonnie Mazzeo, Powell's other two witnesses, testified about estimates their company had prepared to remediate mold in Powell's house.[5] Coll first inspected Powell's house in late 2016, after which he prepared an estimate to remediate the mold. Mazzeo prepared a second, larger estimate after reinspecting Powell's house in December 2018 or January 2019 when the mold had worsened.

### 2. Powell's Response to USAA's Motion for Summary Judgment

Powell responded to USAA's motion for summary judgment, primarily arguing that USAA could not seek summary judgment on a ground not raised in its letters rejecting her claims. Powell did not refute USAA's arguments regarding the air conditioning leak, damage caused by animals, or damage caused by vent pipes. She conceded that the washing machine overflowed prior to the April 5 policy effective date. Instead, Powell argued that a fact issue existed regarding the cause of the roof leaks—whether they were caused by wind or hail during the Tax Day Floods rather than gradual, long-term leaks. Powell acknowledged that her policy excluded mold damage, but she argued that USAA was nevertheless liable for it because its failure to pay her claims in a timely manner caused the mold.

Powell relied on USAA's summary judgment evidence as well as depositions of USAA's adjuster and internal investigator, USAA's emails, and Powell's bank

---

[5] The estimates are not included in the record on appeal.

14

records. Powell primarily relied on the evidence attached to her response to show that she had not made any misrepresentations to USAA regarding her claims as stated in USAA's rejection letters.[6]

### 3. USAA's Reply

USAA filed a reply. It argued that Powell could not establish any damage occurred during the policy period, that mold and flood damage are not covered under the policy, and that Powell could not establish her claims for violations of the Insurance Code as a matter of law.

The trial court granted USAA's motion for summary judgment and dismissed Powell's claims with prejudice. The order did not state whether it granted USAA's motion on the no evidence or traditional basis. This appeal followed.

## Summary Judgment

### A. Standard of Review

We review de novo a district court's grant of summary judgment. *Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007). When, as here, a party moves for summary judgment on both traditional and no-evidence grounds, we first consider the no-evidence motion. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). To defeat a no-evidence

---

[6] Powell also relied on her exhibits to show that USAA did not contest Powell's ownership in her house, the insured property.

motion, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements of her claims. *Id.* The evidence is considered in the light most favorable to the nonmovant, and every reasonable inference is indulged in the nonmovant's favor. *Id.* If the nonmovant does not overcome its no-evidence burden on any claim, we need not address the traditional motion on the same claim. *Id.*

A party moving for traditional summary judgment bears the burden to prove that there is no genuine issue of material fact on at least one element of the plaintiff's cause of action and that it is entitled to judgment as a matter of law. *Id.* (citing TEX. R. CIV. P. 166a(c) and *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017)). If the movant meets its burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Am. Risk Ins. Co. v. Serpikova*, 522 S.W.3d 497, 501 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000)). When reviewing a traditional motion for summary judgment, we review the evidence in the light most favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in favor of the nonmovant. *Lightning Oil*, 520 S.W.3d at 45 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). The evidence raises a fact issue if reasonable and

16

fair-minded jurists could differ in their conclusions in light of all the summary judgment evidence. *Serpikova*, 522 S.W.3d at 501.

**B.      Prompt-Payment Provision of the Insurance Code**

Powell argues that language in a provision of the Insurance Code requiring insurers to provide prompt, written rejection of insurance claims binds the insurer to the reasons stated in the rejection letter when later defending itself in a lawsuit. Insurance Code section 542.056 requires an insurer to accept or reject a claim in writing within fifteen business days after the insurer receives all the information the insurer requires to secure the final proof of loss. TEX. INS. CODE § 542.056(a). Subsection (c), on which Powell relies, requires the insurer's written notification to "state the reasons for the rejection." *Id.* § 542.056(c).

According to Powell, USAA denied her claims based on misrepresentation and concealment of facts, but it moved for summary judgment on the ground that her claimed losses preexisted or were excluded under the policy. Powell contends this is prohibited by section 542.056(c) and, therefore, summary judgment was improper. USAA responds that its defense in this lawsuit is consistent with the reasons stated in its rejection letters and that, in any event, summary judgment is appropriate for a reason not stated in the rejection letter if the reason was valid and existed at the time the claim was rejected.

Powell does not cite any cases to support her argument on appeal, although she contends that the issue is one of first impression. Assuming without deciding that section 542.056(c) binds an insurer defending a lawsuit filed by an insured to the reasons stated in the insurer's letter rejecting an insurance claim, we disagree with Powell that USAA's defense in this case is inconsistent with the reasons stated in its rejection letters.

Although all three letters stated the same coverage decision—rejection of Powell's claims due to misrepresentation and concealment of facts—the letters provided additional detail. The letter rejecting Powell's claim for the air conditioner leak stated that Powell could not recall when the damage occurred. Similarly, the letter rejecting the claim for the overflowed washing machine stated that Powell had admitted the loss occurred in March 2016, prior to the effective date of the policy. And the letter rejecting the roof leak claim stated that Powell's roof damage was not caused by wind or hail, but rather by wear and tear or maintenance issues that were not covered under the policy. The rejection letters for the washing machine overflow and roof leaks further stated that the cause of the damage was from "marred" vent pipes that allowed moisture to penetrate through the roof.

These additional reasons provided in the rejection letters are consistent with USAA's motion for summary judgment, which argued that Powell had no evidence her claimed losses were covered under the policy or occurred during the policy

period. Accordingly, we conclude that USAA's defense in this lawsuit is consistent with the reasons stated in its letters rejecting Powell's insurance claims.

We overrule this part of Powell's issue.

## C.    Breach of Contract

Powell next argues that genuine issues of material fact exist regarding whether her loss is covered under the policy effective in April 2016.

We interpret insurance contracts using well-established principles of contract construction. *Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 467 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010)). The interpretation of an unambiguous contract is a matter of law for the court to determine. *Id.* "If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law." *Id.* at 468 (quoting *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)).

Whether a particular provision or the interaction among multiple provisions creates an ambiguity is also a question of law. *Id.* "The fact that the parties may disagree about the policy's meaning does not create an ambiguity." *Id.* (quoting *Page*, 315 S.W.3d at 527). "Only if the policy is subject to two or more reasonable interpretations may it be considered ambiguous." *Id.* (quoting *Page*, 315 S.W.3d at 527). Extrinsic evidence may not be used to contradict or vary the meaning of the

19

explicit language of a written contract. *Id.* "If, however, a contract is susceptible to more than one reasonable interpretation, we will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).

"Our primary goal is to determine the contracting parties' intent through the policy's written language." *Davis*, 484 S.W.3d at 468 (quoting *Page*, 315 S.W.3d at 527). Reviewing courts must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provisions within the policy inoperative. *Id.* Our analysis of the policy is confined to the four corners of the policy itself. *Id.*

To establish a breach of contract, a plaintiff must show: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Id.* In the context of an insurance policy, a plaintiff must prove the existence of a valid insurance policy covering the denied claim and entitlement to money damages on that claim. *Id.* The insured bears the initial burden to establish coverage under the policy. *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014). If the insured meets her initial burden, the insurer must then prove that one of the policy's exclusions applies in order to avoid liability. *Id.* If the insurer shows

that a policy exclusion applies, the burden shifts back to the insured to establish that an exception to the exclusion restores coverage. *Id.*

### 1. Actual Injury Approach Versus Manifestation Approach

As an initial matter, the parties dispute whether a loss must actually occur during the policy period or whether the damages must manifest during the policy period. Powell contends that, as a matter of law, a property loss is covered if the damage manifests during the policy period regardless of when it occurred. USAA responds that, as a matter of law, the loss must occur during the policy period for coverage to apply regardless of when the damage is discovered or manifests.

The Texas Supreme Court's opinion in *Don's Building Supply, Inc. v. OneBeacon Insurance Co.* is instructive here. 267 S.W.3d at 22–26. In that case, the Court construed a third-party liability provision in a commercial general liability policy concerning the insurer's duty to defend. *Id.* at 22–23. The Court distinguished the "actual injury" or "injury-in-fact" approach—under which property damage occurring during the policy term is covered—from the "manifestation" approach— under which property damage that becomes evident or discoverable during the policy term is covered. *Id.* at 25–26. These "varying approaches reflect perceived differences in the policy language under review" and "different factual circumstances," such as "the difficulty encountered . . . by an alleged delay between the time of property damage and the discovery of that damage." *Id.* at 25.

21

The Court ultimately applied the "actual injury" approach, holding that the text of the policy afforded no other choice. The policy provided a one-year term of liability coverage for property damage or bodily injury that "occurs during the policy period." *Id.* at 24. The policy defined "property damage" to include "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it[.]" *Id.* Based on the plain meaning of these provisions, the Court held that property damage under the policy "occurred when actual physical damage to the property occurred." *Id.* "The policy says as much, defining property damage as '[p]hysical injury to tangible property,' and explicitly stating that coverage is available if and only if '"property damage" occurs during the policy period.'" *Id.*

Here, the relevant section of the USAA policy, Section I, states: "We insure against 'sudden and accidental', direct, physical loss to tangible property described in PROPERTY WE COVER—COVERAGES A AND B [the dwelling and other structures] unless excluded in Section I—LOSSES WE DO NOT COVER." The policy contains substantially similar language regarding coverage for personal property, except that the loss must be "caused by a peril listed below[,]" including windstorm or hail. The policy defines "[s]udden and accidental" as "an abrupt, fortuitous event which is unintended from the perspective of a reasonable person." *See Don's Bldg. Supply*, 267 S.W.3d at 24 ("[A]n accident is generally understood

22

to be a fortuitous, unexpected, and unintended event.") (quoting *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007)). The policy further provides, "This policy applies only to loss in SECTION I . . . which occurs during the policy period."

The policy here is similar to the policy at issue in *Don's Building Supply*, which defined property damage as "physical injury to tangible property" and provided coverage only if the property damage "occurs during the policy period." The USAA policy uses the term "physical loss" and provides that the policy applies only to a loss which "occurs during the policy period." We therefore conclude that no ambiguity exists in the policy and that the only reasonable interpretation of the policy is that it covers a loss that actually "occurs during the policy period," not an earlier loss that manifests during the policy period. *See Davis*, 484 S.W.3d at 468 (stating that insurance policy is ambiguous only if policy is subject to two or more reasonable interpretations).

## 2.    Washing Machine Overflow

Powell concedes on appeal, as she did in her response to USAA's motion for summary judgment, that the washing machine leak occurred before the effective date of the policy in April 2016. Powell did not produce a scintilla of evidence raising a genuine issue of material fact on this claim. *See Lightning Oil*, 520 S.W.3d at 45. Accordingly, we conclude that no-evidence summary judgment was proper on

Powell's claim for damage resulting from the washing machine overflow. We overrule this part of Powell's issue.

### 3. Air Conditioning Leak

Powell does not argue on appeal or provide any evidence showing that her air conditioning leaked during the policy period. Accordingly, she has not met her no-evidence burden on this claim, and she has waived any error regarding this claim. *See id.*; TEX. R. APP. P. 38.1(g), (i). We overrule this part of Powell's issue.

### 4. Roof Leaks

Powell argues that disputed facts exist regarding her roof leaks. Although she concedes in her brief that she does not know when the damage to her roof occurred, she contends that USAA's engineer, SEC, reported that hail one inch in diameter was detected at her house on April 17, 2016, and that it hailed for more than twenty minutes. She also argues that Raney testified that he observed hail damage to the shingles of Powell's roof, and that larger hail falling for a duration of fifteen to twenty minutes increases the chance of roof damage. She further argues that Raney testified that hail, rather than long-term wear and tear, caused the water damage to the interior of her home based on the significant damages.

USAA responds that Powell's roof had not been replaced since she bought the house in 2010, that USAA's engineers determined the damage was old and not from April 2016, and that no evidence shows that Powell's personal property damage

24

occurred as a result of rain entering through a wind or hail created opening. USAA further argues that Powell's witnesses could not state when the interior damage occurred, and it could have occurred as a result of improper maintenance or vermin. USAA also argues that the evidence shows the roof leaked as a result of vermin and damaged roof vents.

Powell's policy covered damage to her dwelling unless the policy excluded the damage, and it covered damage to her personal property from wind or hail unless the damage was excluded. The policy excluded damage to the dwelling from wear and tear and vermin unless the damage was water damage, in which case the policy covered the resulting water damage.

According to SEC, which inspected Powell's home in July 2016, weather data "reported up to 1.00-inch hail fall at the location of [Powell's house]" on April 17, 2016, and the attached weather data estimated the hail lasted for more than twenty minutes. The report additionally stated that Powell's roof showed evidence of "approximately 1/4-inch hail," although it concluded that there were "[n]o punctures, visible depressions, or randomly-patterned roughly-circular areas of missing granules consistent with hail impacts" on Powell's roof or patio structure and, accordingly, the hail "was of insufficient mass and velocity to cause damage to the roofing." The report offered numerous conclusions for the cause of the damages to the interior of Powell's house, including animal damage to vent pipes and repeated

25

and ongoing condensation leaks from the air conditioning system. USAA's letter rejecting Powell's roof claims relied on SEC's report to conclude that the roof damage occurred from wear and tear or maintenance issues and marred vent pipes.

Insight, the second engineer hired by USAA after Powell filed her lawsuit, inspected Powell's house two years after the Tax Day Floods. Insight determined that much of the interior damage to Powell's house was due to long-term water exposure from the washing machine, air conditioning system condensation, and roof vents. The report stated that Powell's roof was in good condition and appeared to be less than ten years old.

Powell testified that hail fell at her house during the Tax Day Floods. Raney, Powell's roofer, saw signs of hail damage when he inspected Powell's house. He testified that the most recent hailstorm prior to his inspection was during the Tax Day Floods, although he could not definitively say whether that hailstorm caused the damage he observed. He also testified that, even if the hail is smaller in size, a longer duration and higher density of hail are more likely to cause roof damage. Raney did not, however, rule out that maintenance issues or animal damage to vent pipes damaged the interior of Powell's house.

Nevertheless, Powell concedes in her brief that she does not know when the damage to her roof occurred, and that it could have been in 2013 or 2015. As stated above, the plain language of Powell's policy applies only to a loss that actually

occurs during the policy period, not an earlier loss that manifests during the policy period. *See Don's Bldg. Supply*, 267 S.W.2d at 25–26. Powell's concessions that she does not know when the damage occurred and that it may have occurred prior to the policy period preclude a genuine issue of material fact. *See Lightning Oil*, 520 S.W.3d at 45; *Serpikova*, 522 S.W.3d at 501. We therefore conclude that summary judgment was proper on Powell's claim of damage from her roof. We overrule this part of Powell's issue.

### 5. Mold

Powell argues that USAA is liable for mold damage to her home despite the policy's exclusion of mold damage because USAA's failure to pay her claims in a timely manner caused the mold to develop. We disagree. The policy expressly excludes "damage consisting of or caused directly or indirectly by . . . microbial organisms, including mold." The policy also provides that, after a loss, an insured must mitigate any damage by protecting the property from further damage and by making reasonable and necessary repairs to protect the property. Powell testified that she did not remediate the mold growth. Thus, not only does the policy expressly exclude mold, but Powell did not comply with her duty to mitigate her damages.[7] We conclude that Powell did not produce a scintilla of evidence raising a genuine

---

[7]     The policy does, however, provide that USAA will repair or tear out and replace property damage resulting from a covered loss even if mold is present.

issue of material fact on this claim. *See Lightning Oil*, 520 S.W.3d at 45. We overrule this part of Powell's issue.

### 6. Flood Damage

USAA argues on appeal that any damage caused by flooding is not covered under the policy, an issue Powell does not address. *See id.* The policy expressly excludes water damage caused by flooding, which Powell conceded during her deposition. Thus, to the extent Powell's damage was caused by flooding, we agree with USAA that it is not covered under the policy. We overrule this part of Powell's issue.

## D. Insurance Code Violations

On appeal, Powell does not argue or point to any evidence showing that USAA violated the Insurance Code. *See id.* She does not argue that USAA inspected the property after the statutorily required period, as alleged in her petition, or point to any authority supporting this claim. *See* TEX. R. APP. P. 38.1(i). And although she generally complains that USAA took nine months to reject her claim, the prompt-payment provision applies to the date "the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." TEX. INS. CODE § 542.056(a) (requiring insurer to notify claimant in writing of acceptance or rejection of claim "not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof

of loss"). If the insurer cannot accept or reject a claim with the fifteen-day period, it may notify the claimant of the reasons it needs additional time and it must accept or reject the claim within forty-five days of the notice to the claimant. *Id.* § 542.056(d).

USAA did not receive the legal opinion regarding coverage from its outside counsel until March 2017. *See id.* § 542.056(a). USAA's claim notes show that it also received an additional inventory of claimed property damage in March. A USAA representative spoke to Powell's attorney on March 23, 2017, and notified him that it needed additional time to review the new inventory. *See id.* § 542.056(a), (d) (providing that "[i]f the insurer is unable to accept or reject the claim within the period specified by Subsection (a) . . . , the insurer, within that same period, shall notify the claimant of the reasons that the insurer needs additional time" and insurer must accept or reject claim within forty-five days). USAA rejected Powell's claims on March 30. Powell does not argue how this timeline violated section 542.056. We conclude that Powell has not raised a genuine issue of material fact on her claims that USAA violated the Insurance Code. *See* TEX. R. CIV. P. 166a(c); *Lightning Oil*, 520 S.W.3d at 45; *Serpikova*, 522 S.W.3d at 501. We overrule this part of Powell's issue.

## Conclusion

We affirm the trial court's judgment. We dismiss any pending motions as moot.

April L. Farris
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Farris.