**REVERSE and REMAND and Opinion Filed July 29, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-23-00512-CV

## TRINITY INDUSTRIES LEASING COMPANY, Appellant
## V.
## LATTIMORE MATERIALS CORP., Appellee

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-08632**

## MEMORANDUM OPINION

Before Justices Reichek, Goldstein, and Garcia
Opinion by Justice Garcia

This case involves application of the statute of limitations to a railroad car lease agreement requiring prompt reimbursement for damage to the railcars. A jury found that Lattimore Materials Corp. ("Lattimore") breached the lease (the "Lease") and awarded Trinity Industries Leasing Company ("Trinity") $1.6 million for lost rent and $9 million for failure to reimburse Trinity for corrosion damage to the railcars. The trial court entered judgment for Trinity awarding lost rent, interest, and attorney's fees, but relied on a jury finding about when Trinity knew about the corrosion to disregard the corrosion damage award.

Trinity now argues the evidence is legally insufficient to establish the statute of limitations bars the jury's corrosion damage award. Alternatively, Trinity argues the jury's date finding cannot bar recovery because the Lease is a continuing contract.

We conclude that corrosion damage, in and of itself, is not a breach of the unambiguous terms of the Lease and therefore cannot trigger limitations on Trinity's claim for breach. Article 13, the Lease provision concerning corrosion damage, was not breached until Lattimore refused to reimburse Trinity for loss, damage, or expense that Trinity suffered as a consequence of railcar corrosion. The evidence shows this did not occur until January 2020 when Latimore terminated the Lease before the expiration of its term. Accordingly, Trinity's June 2020 suit was not time barred.

We therefore reverse the trial court's judgment and render judgment that Trinity is entitled to recover the $10,661,000 in actual damages found by the jury for breach of articles 4 and 13 of the Lease, attorney's fees, and pre- and post-judgment interest on the actual damages. We remand the case to the trial court for entry of judgment consistent with this opinion.

## I. BACKGROUND

Trinity is a Texas-based company that manufactures, sells, and leases railcars. Lattimore is an aggregates and ready-mix concrete producer that is a wholly owned by Holcim Ltd., a Swiss multinational company.

Trinity and Lattimore entered into the Lease in 2009. The Lease provided that Trinity would lease railcars to Lattimore pursuant to "Riders," which the parties executed separately. Riders were executed and renewed in 2010, 2013, and 2018.

Article 4 of the Lease addresses the payment of rent, and obligates Lattimore to pay monthly rent for each car from the date the car is delivered until the date of its return. The applicable Rider specifies the amount due and number of cars. Article 10 describes the parties' maintenance responsibilities and requires that Trinity maintain the railcars in good condition "according to the Interchange Rules." This Article also prevents Lattimore from making repairs without Trinity's prior written consent, and requires Lattimore to promptly notify Trinity if a car is damaged or in need of repair. Article 17 describes the condition in which the railcars were to be returned to Trinity, stating: "At the expiration of the Lease term as provided in the Riders, [Lattimore] shall, at its expense, return the cars to [Trinity] at the location and to the agent selected by [Trinity] empty, clean and free from residue, and in the same good condition as the cars were when delivered, except for normal wear and tear."

Article 13 concerns reimbursement for corrosion and other damage to the railcars, and provides as follows:

> Notwithstanding the exception for normal wear and tear in Article 17,[4] if during the term of any Rider any of the Cars or any components or appurtenances thereto shall be unduly or materially damaged, destroyed or depreciated in value or condition due to the corrosive or other damaging effect of any substance carried therein or thereon

–3–

(whether or not such damage was foreseeable), [Lattimore] will reimburse [Trinity] promptly for such damage, loss or expense suffered by [Trinity] as a consequence thereof and no abatement of rent shall occur during the period in which repairs are performed.

Following execution of the Lease and Riders, Lattimore used the railcars every day to haul limestone aggregate from its quarry in Stringtown, Oklahoma to various ready-mix sites in Texas. Lattimore would wash the aggregate material and, while still wet, load that material into the railcars. This commodity and wet-loading process took its toll and caused considerable corrosion to Trinity's railcars. As early as 2013, the contractor retained by Trinity to service and maintain the railcars observed corrosion and scaling of the side sheets, side scopes, and hinges on the railcars. As Trinity's expert explained, the corrosion "happen[ed] from the inside out." It was caused by "the rock and the water that was brought into contact with the steel, and the amount of time that it was kept in contact with the steel."

When two Riders expired in 2018, Lattimore continued to lease and use the railcars on a month-to-month basis as the parties negotiated renewal Riders. During these negotiations, Lattimore requested an inspection to assess liability if the Lease were to end and Lattimore returned the cars. This led to a joint inspection of two representative railcars in June 2018. The inspection revealed that the railcars were "heavily corroded and in need of repair," such that "all of [the] cars may require a complete re-body."

Trinity informed Lattimore that if all the railcars were in the same condition when returned to Trinity, Lattimore would owe Trinity about $60,000 per railcar

–4–

($13.5 million total). Lattimore did not dispute its obligation to reimburse Trinity for the corrosion damage.

Because the railcars were still operable and capable of profitable use, Trinity gave Lattimore the option of deferring the cost of repairing the railcars. Lattimore did not pay for repairs and in December 2018, renewed the Riders through November 2021. Lattimore agreed the renewal was "conclusive evidence of the fit and suitable condition of such car or cars."

Nonetheless, railcar corrosion continued to be a problem. At Lattimore's request, Trinity's mobile railcar inspection team conducted an inspection, which revealed "corrosion to the car bodies" was "beginning to present a bigger problem." The side sheets were tearing, and although the parties had "been able to patch these to keep the cars in service . . . the inspection concluded that "the situation [would] continue to get worse."

Trinity met with Lattimore in January 2019 to review the findings from the corrosion inspection. Trinity again told Lattimore that Lattimore's loading of wet limestone aggregate was the cause of the corrosion, and suggested that Lattimore might avoid further damage by switching to a dry loading process in which limestone is washed and allowed to drain and dry outside of the railcars before loading. Trinity also reminded Lattimore that "[d]amage to the Railcars by loading is Lattimore's responsibility." Lattimore did not dispute its responsibility under the Lease.

Trinity gave Lattimore two alternatives: Trinity could either (1) "rebody" the railcars at Lattimore's expense (possibly by restructuring the Lease to help defray Lattimore's costs), or (2) begin selling the railcars to Lattimore over time, such that Lattimore would not incur the cost of the corrosion damage all at once. If Lattimore elected to rebody the cars, Trinity expected that the process would be completed about fifty cars at a time, and planned to loan Lattimore replacement cars as the rebody process was completed. Lattimore appeared to be interested in a restructured lease where Trinity would absorb a portion of the rebody cost and finance that cost in the restructured lease. But Lattimore asked for time to consult with management and evaluate these options. Throughout 2019, Lattimore continued to use the railcars and continued to load them with wet limestone aggregate every day.

Then, on January 28, 2020, Lattimore sent a letter to Trinity stating that it was terminating the Lease because, inter alia, Trinity failed to maintain the railcars in good condition under Article 10 and failed to address the onset of corrosion. Accordingly, Lattimore advised that "Lattimore cannot continue to utilize the leased hopper railcars as the parties contemplated given their unsafe condition." Lattimore stopped making rental payments under the Lease.

In response to Lattimore's letter, Trinity noted that Lattimore's wet loading process caused the physical damage, and the Lease obligated Lattimore to compensate Trinity for that damage. Trinity demanded that Lattimore cure its defaults under the Lease and fulfill its obligations to pay. Lattimore refused.

Consequently, in June 2020, Trinity initiated the underlying suit against Latimore seeking damages for breach of Articles 4, 13, and 17 of the Lease. Lattimore counterclaimed for breach of Article 10 and fraud, and asserted that limitations barred Trinity's claims under Article 13 because Trinity sued "7 ½ years" after it knew about "the start of corrosion" to the railcars.

After a two-week trial, the case was submitted to the jury on the parties' breach of contract claims.[1] The jury found that Trinity did not breach Article 10 of the Lease, and Lattimore breached Articles 4 and 13.[2] The jury awarded Trinity $1.661 million in damages for the Article 4 breach and $9 million for Lattimore's failure to reimburse Trinity for loss, damage, and expense under Article 13. The jury was also asked to find when Trinity knew or should have known of Lattimore's failure to comply with Article 13. Specifically, Question 3(d), submitted over Trinity's objection, inquired:

> d) By what date did Trinity know or should have reasonably known of Lattimore's failure to comply with Article 13?

> Article 13 provides as follows:

> Notwithstanding the exception for normal wear and tear in Article l7, if during the term of any Rider any of the Cars of any components or appurtenances thereto shall be unduly and materially damaged, destroyed or depreciated in value or condition due to the corrosive or other damaging effect of any substance carried therein or thereon (whether or not such damage was foreseeable), Lattimore will

---

[1] The trial court refused to submit Lattimore's fraud claim to the jury.

[2] The jury also found that Lattimore breached Article 17 of the Lease, but found that breach was excused.

reimburse Trinity promptly for such damage, loss or expense suffered by Trinity as a consequence thereof and no abatement of rent shall occur during the period in which repairs are performed.

The jury responded "12/31/15."

Trinity moved for judgment on the jury's damages findings and asked the court to disregard the jury's date finding in Question 3(d) as "legally immaterial to Lattimore's limitations defense." Trinity argued that unless Lattimore failed or refused to reimburse Trinity, there was no breach, and thus, no limitations accrual.

After a hearing, the court declined to include the $9 million award for the Article 13 breach in the judgment. But the judge invited Trinity to file a JNOV motion addressing the charge conference discussion about Question 3(d) and the applicability of the continuing contracts doctrine.

Trinity filed a JNOV motion. After multiple hearings, the trial court denied the motion. Trinity appeals from the denial of that motion and final judgment.

## II. ANALYSIS

### A. Standard of Review

Trinity argues the trial court should have granted its JNOV motion as to the jury's date finding in question 3(d). We review the denial of a JNOV motion for under a legal sufficiency standard. *Brown v. Zimmerman*, 160 S.W.3d 695, 702 (Tex. App.—Dallas 2005, no pet.); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990). This review is de novo. *COC Servs. v. CompUSA*, 150 S.W.3d 654, 662 (Tex. App.—Dallas 2004, pet. denied).

In our de novo review, we disregard a jury finding when there is no evidence to support the finding, or the finding is immaterial. *See* TEX. R. CIV. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). "A finding is immaterial when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings." *Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 467 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). "A jury question is [also] considered immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict." *BP Am. Prod. Co. v. Red Deer Res., LLC,* 526 S.W.3d 389, 402 (Tex. 2017) (quoting *City of Brownville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995)).

No evidence exists when there is: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). More than a scintilla of evidence exists when the evidence supporting the finding "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499

(Tex.1995) (citation omitted). When determining whether any evidence supports a judgment, we are "limited to reviewing only the evidence tending to support the jury's verdict and must disregard all evidence to the contrary." *Mancorp, Inc.*, 802 S.W.2d at 227. We view the evidence and possible inferences in the light most favorable to the verdict. *Id.* at 228. If more than a scintilla of evidence supports the verdict, it must be upheld. *Garcia v. Ins. Co. of State of Pa.*, 751 S.W.2d 857, 858 (Tex.1988) (per curiam); *Gharda*, 464 S.W.3d at 347.

**B.      Article 13—The Damage Reimbursement Provision in the Lease**

This case turns on the application of the statute of limitations to a breach of Article 13 of the Lease.  A party must bring a breach of contract claim "not later than four years after the cause of action accrues." TEX. CIV. PRAC. & REM. CODE ANN. § 16.004. A claim "accrues when the contract is breached." *Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex. 2006). A contract is breached "when a party fails or refuses to do something he has promised to do." *Capstone Healthcare Equip. Servs., Inc. v. Quality Home Healthcare, Inc.*, 295 S.W.3d 696, 699 (Tex. App.—Dallas 2009, pet. denied). Therefore, the nature of the promise in Article 13 informs our analysis of when performance of that promise failed and a breach occurred.

Neither party argues that Article 13 is ambiguous, nor do we find it so. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018) (explaining that a contract may be ambiguous even though the parties agree it is not). The interpretation of an unambiguous contract is a question of law we review de novo.

–10–

*URI*, 543 S.W.3d at 763; *see also Vincent v. Bank of America*, 109 S.W.3d 856, 867 (Tex. App.—Dallas 2003, pet. denied).

In construing a contract, we must give effect to the parties' intentions as expressed in their agreement." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019); *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023). In so doing, we look to the language of the parties' agreement. *Murphy Expl. & Prod. Co-USA v. Adams*, 560 S.W.3d 105, 110 (Tex. 2018). We interpret contract language "according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

Trinity argues that damage to the railcars by corrosion or otherwise is not a breach, but instead, a breach occurs if Lattimore fails to reimburse Trinity for the damage. Lattimore responds that Article 13 does not predicate liability on a "demand" or "request" for reimbursement, nor does it provide that there is no breach until a demand for payment is refused. According to Trinity, the corrosion damage itself was the limitations triggering event, and the parties were aware of corrosion as early as 2013.

The breach determination depends upon what Lattimore promised to do. *See Capstone*, 295 S.W.3d at 699; *see also Gasper v. Lawnpro, Inc.*, 372 S.W.3d 754, 757 (Tex. App.—Dallas 2012, no pet.) (breach of contract occurs when a party fails to perform an act it has explicitly or impliedly promised to perform). In making this

determination, the agreement's plain, grammatical language is our most important consideration. *See Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020).

Lattimore's obligation under Article 13 rests on a contingency, damage or corrosion to the railcars. Specifically, Article 13 provides that "*if* . . any of the cars . . . shall be materially damaged . . . due to the corrosive or damaging effect of any substance carried therein . . . ." (Emphasis added). This language clearly signifies that Article 13 does not categorically prohibit damage or corrosion to the railcars, and Lattimore does not promise that such damage will not occur. To the contrary, the language reflects that the parties anticipated damage might occur. The clause that follows assigns ultimate responsibility for that damage to Lattimore.

If damage to the railcars occurs, Article 13 provides that "[Lattimore] will reimburse [Trinity] promptly for such damage, loss, or expense suffered by [Trinity] as a consequence thereof." The promise that Lattimore makes is reimbursement for Trinity's loss. "Reimburse" means (i) to make repayment to or for expense or loss incurred, and (ii) to payback, refund, repay." *Prophet Equity L.P. v. Twin City Fire Ins. Co.*, No. 05-17-00927-CV, 2019 WL 3886651, at *10 (Tex. App.—Dallas Aug. 19, 2019, no pet.) (mem. op.); *see also Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 359 (Tex. 2023) (unless otherwise defined in the text, courts adopt a term's ordinary meaning). Article 13's language requiring reimbursement as a consequence

of Trinity's loss is consistent with the commonly understood meaning of reimburse as a repayment or a refund.

We agree with Latimore that Article 13 does not require a demand for payment and it would be inappropriate to insert this requirement in a contract where it does not exist. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003). "A cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Archer v. Tregallas*, 566 S.W.3d 281, 288 (Tex. 2018). Here, the unambiguous language of Article 13 reflects that Lattimore promised to reimburse Trinity for damage, loss, or expense as a consequence of railcar corrosion. A breach occurs if Lattimore fails to perform that reimbursement promise. While a demand for performance could trigger a breach, the Lease imposes no express limitations on when or how breach of the operative promise to reimburse might occur.

Lattimore's argument that it caused legal injury to Trinity when it damaged the railcars is misplaced. That construction would follow only if Lattimore had promised it would not damage the railcars. There was no such promise. We will not rewrite a contract to add or subtract from its language or to "interpolate constraints" not found in the unambiguous language. *See Pathfinder Oil & Gas Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). There was no legal injury to Trinity when the corrosion was first discovered or throughout the term of the Lease because

Lattimore had not refused reimbursement. Damage to the railcars was the event that triggered the reimbursement promise; it was not the promise itself.

Lattimore's reliance on *Cosgrove v. Cade*, 468 S.W.3d 32, 35 (Tex. 2015) is not persuasive. In that case, Cosgrove entered into a contract with the Cades for the purchase of a piece of real property. *Id.* The parties agreed that the Cades were "to retain all mineral rights." *Id.* However, on the date of closing (in October 2006), the Cades executed a warranty deed to Cosgrove that contained no reservation of any mineral rights or interests. The parties also executed a closing agreement providing that they would "fully cooperate, adjust, and correct any errors or omissions and to execute any and all documents needed or necessary to comply with all provisions" of the real estate contract. *Id.*

In December 2010, the Cades realized that they had failed to reserve the minerals. *Id.* Through counsel, the Cades sent a request to Cosgrove demanding that she sign a correction deed. *Id.* She refused to do so, and the Cades filed suit in February 2011. *Id.* The petition alleged that Cosgrove had breached both the original contract and the closing agreement. *Id.* Cosgrove sought summary judgment as to the breach of contract claims, arguing that both were barred by the four-year limitations period. *Id.* The trial court agreed and granted summary judgment in favor of Cosgrove. *Id.* The Court of Appeals reversed, and Cosgrove appealed to the Texas Supreme Court. *Id.*

The Texas Supreme Court reviewed the case to determine "how long the Cades [could] sit on their putative right to request material changes to an unambiguous deed on file in the courthouse." *Id.* at 40. In reversing the court of appeals (and reinstating summary judgment on limitations grounds), the Texas Supreme Court held that the discovery rule does not apply to obvious omissions from the face of a deed and the Cades were charged with notice of the deed's contents at the time of execution. *Id*. at 39. In so concluding, the court held that the Cades could not rely on the closing agreement to recast their deed reformation claim as a breach of contract, thereby circumventing the statute of limitations. *Id.* By the time the Cades asked Cosgrove to reform the deed in accordance with the closing agreement, limitations had expired. *Id.*

*Cosgrove* has little, if any, application to the present case. This case does not involve reformation of a deed or the discovery rule. Neither party contends that a material term of the Lease was omitted, that Lattimore's breach was not discovered until after limitations had run, or that a corollary contract changes the operative dates for purposes of limitations. Instead, our consideration involves construction of the terms of an unambiguous contract executed between two sophisticated parties seeking to assign responsibility for contingent damage and resulting loss. The express terms of that contract govern our determination. *See Murphy Exp.*, 560 S.W.3d at 110.

We reject Lattimore's suggestion that our interpretation allows Trinity to create its own accrual date. Damage to the railcars, of itself, was not a limitations triggering event—there was no actionable breach unless and until Lattimore failed to reimburse Trinity for economic loss caused by such damage. Although the Lease does not specify a time for performance, the limitations accrual date does not begin when performance is due. Rather, limitations is not triggered unless and until performance fails or is refused. *See Barker*, 213 S.W.3d at 311 (limitations accrues when contract is breached).

Similarly, we decline to consider Article 13's use of the term "promptly" in isolation. *See Fischer v. CTMI, L.L.C.,* 479 S.W.3d 231, 239 (Tex. 2016) (courts construe contracts as a whole). Context matters when interpreting a contract. *In re Whataburger Rests. LLC*, 645 S.W.3d 188, 196 (Tex. 2022) (orig. proceeding). Lattimore argues that Trinity's knowledge of material damage "triggered the right to seek reimbursement," and required "immediate repayment." This argument confuses the distinction between when the repayment obligation arises and when it is breached. We agree that physical damage to the railcars triggered Lattimore's obligation to reimburse, and Trinity suffered economic damage when the railcars were physically damaged. But there is no compensable breach unless Lattimore fails to reimburse Trinity for that damage.

Considering the entirety of Article 13 in context, the parties' use of the term "promptly" to describe when reimbursement shall occur does not equate to

–16–

immediate repayment upon physical damage to the railcars. That construction would transform Article 13 into an absolute prohibition on railcar damage. Moreover, the parties' use of "immediately" in two other provisions of the Lease supports the conclusion that the parties' intended something other than immediate reimbursement when they used the word "promptly" in Article 13.[3] *See Sundown Energy, L.P. v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021).

Lattimore's argument also ignores the distinction between physical damage to the railcars and the economic damage to Trinity that results. The first reference to damage in Article 13 refers to the railcars. In the second clause, Lattimore promises to reimburse Trinity for "damage, loss, of expense suffered by [Trinity] as a consequence thereof." This second reference to damage simply describes what Lattimore has promised to reimburse. Conflating the damage to the railcars requirement in the first clause with the economic loss to Trinity described by the second clause would render the second clause meaningless, and ignores the promise itself, which is to reimburse Trinity for economic damage caused by the physical damage.[4] We are required to read contractual provisions so that none of the terms are rendered meaningless or superfluous. *See In re Davenport*, 522 S.W.3d 452, 457

---

[3] Article 2 provides that railcars already in Lattimore's possession "shall be deemed delivered . . . immediately," and Article 10 provides that title of replacement parts "shall be immediately vested."

[4] Article 13 can be read to presume that physical damage to the railcars results in economic loss to Trinity. That presumption, however, does not mean that physical damage and economic damage are the same.

(Tex. 2017) (orig. proceeding); *Shops at Legacy (RPAI) L.P. v. Del Frisco's Grille of Texas, LLC*, No. 05-19-01274-CV, 2020 WL 4745548, at *3 (Tex. App.—Dallas Aug. 17, 2020, pet. denied) (mem. op.).

Further, even if a contract is unambiguous, we may consider the surrounding facts and circumstances as an "aid in the construction of the contract's language." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017). While surrounding facts and circumstances cannot be employed "to make the language say what it unambiguously does not say or to show the parties meant or could have meant something other than what their agreement stated," *URI*, 543 S.W.3d at 763, "extrinsic evidence—such as prior negotiations, prior dealings, and trade usage may be considered to give the words of a contract meaning consistent with that to which they are reasonably susceptible." *Barrow-Shaver*, 590 S.W.3d at 484; *see also Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (surrounding circumstances can be used to inform the contract text and render it capable of only one meaning). We have concluded that the parties' intentions are expressed in the unambiguous terms of the Lease, but note that the actions of the parties here are consistent with our understanding of the contractual language the parties chose. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App.—Houston [14th Dist.] Jan. 20, 2000, pet. denied) (observing that courts can consider surrounding circumstances to understand the objective and purpose of the contractual language the parties' chose).

Lattimore requested an inspection in 2018 to determine its liability if the Lease ended. Trinity responded that if the railcars were in the same condition when returned to Trinity, Lattimore would owe Trinity about $60,000 per car. These discussions, and the subsequent discussions in 2019 about restructuring the Lease reflect that the parties were aware of the corrosion damage and considered Lattimore responsible for that damage. Thus, the promise to reimburse was operative as a result of the damage. But the discussions about how to structure performance of that obligation is consistent with our understanding that the time for performance had yet to occur.

Based on the unambiguous language of the Lease, we conclude the trigger for accrual of Trinity's breach of contract claim is Lattimore's failure or refusal to reimburse Trinity for damage to the railcars because the Lease specifies that reimbursement is the promise Lattimore agreed to perform.

## C. Evidence Supporting the Jury's Date Finding on the Article 13 Breach

Having concluded that Article 13 was not breached and limitations was not triggered until Lattimore failed or refused to reimburse Trinity for the railcar damage, we next consider the evidence supporting the jury's finding that Trinity knew or should have known of the breach on December 31, 2015.

During closing argument, Lattimore's counsel conflated knowledge of the corrosion with a breach of Article 13. He played a video clip of the deposition

testimony of Shawn Francis who testified that corrosion occurred, to the best of his recollection, sometime prior to the year 2106.

Then, Lattimore's counsel told the jury to write in "12/31/15" as the answer to Question 3(d) based on this testimony. Specifically, he argued:

> [I]f you go to [Question] 3(d), by what date did Trinity know or should have reasonably known of Lattimore's failure to comply with Article 13? You just heard it. Shawn Francis, he said sometime prior to 2016. I'll represent to you that would mean December 31st, 2015, and I would write down that date.

The Lease, however, does not provide that Article 13 is breached when corrosion damage occurs. The jury may not imply a term into an unambiguous contract. *JM Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

Lattimore relies on evidence from which the jury could have concluded that the railcars were materially damaged, destroyed, or depreciated in value or condition prior to December 31, 2015. This includes evidence that corrosion was observed as early as 2013, and testimony that once corrosion occurs, it doesn't get any better. Temporary fixes were applied so that the hinges would not lock up, but nothing was done to address corrosion damage to the steel sheets. And Trinity knew, as of at least 2014, that the wet aggregate loading process was also causing corrosion damage to railcars leased by other customers. This evidence, however, establishes only that the parties knew corrosion was occurring and causing damage to the railcars. When that occurred, Lattimore became obligated to reimburse Trinity for the damage. But Trinity did not suffer a compensable injury unless and until Lattimore failed to do

–20–

so. And there is no evidence that Trinity knew or should have known that Lattimore would not reimburse it for corrosion damage to the railcars before Lattimore wrongfully terminated the Lease in January 2020.

Therefore, the trial court erred in concluding that the statute of limitations bars the jury's damage award for the Article 13 breach. Trinity's first issue is sustained.

### III.  CONCLUSION

Having sustained Trinity's first issue, we need not consider its alternative remaining issue. *See* TEX. R. APP. P. 47.1. We reverse the trial court's judgment, render judgment that Trinity is entitled to recover the $10,661,000 in actual damages found by the jury for breach of articles 4 and 13 of the Lease, attorney's fees, and pre- and post-judgment interest on the actual damages, and remand the case to the trial court for entry of judgment consistent with this opinion.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

230512F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TRINITY INDUSTRIES LEASING COMPANY, Appellant

No. 05-23-00512-CV     V.

LATTIMORE MATERIALS CORP., Appellee

On Appeal from the 68th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-20-08632. Opinion delivered by Justice Garcia. Justices Reichek and Goldstein participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that Trinity is entitled to recover the $10,661,000 in actual damages found by the jury for breach of articles 4 and 13 of the Lease, attorney's fees, and pre- and post-judgment interest on the actual damages. We **REMAND** the case to the trial court for the entry of judgment consistent with this opinion.

It is **ORDERED** that appellant TRINITY INDUSTRIES LEASING COMPANY recover its costs of this appeal from appellee LATTIMORE MATERIALS CORP.

Judgment entered this 29h day of July 2024.